IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KEVIN BERNSTEIN, | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | No. 3:21-CV-2131-K |
| | § | |
| | § | |
| MAXIMUS FEDERAL SERVICES, INC., | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Before the Court is a motion for summary judgment, pursuant to Rule 56 of

the Federal Rules of Civil Procedure, and accompanying brief, filed on April 15,

2024, by Defendant Maximus Federal Services, Inc. (Dkt. Nos. 54, 55.) The motion

was referred to the undersigned United States magistrate judge for hearing, if

necessary, and findings and recommendation. (*See* Dkt. Nos. 63, 64.)

Plaintiff Kevin Bernstein filed a response on May 13, 2024 (Dkt. No. 61), to

which Maximus filed a reply on May 24, 2024 (Dkt. No. 62). Bernstein's response

included an appendix of exhibits that did not comply with the Court's Local Rules.

(*See* Dkt. No. 61.) Accordingly, on October 29, 2024, the undersigned ordered

Bernstein to file the exhibits in compliance with the Court's Local Rules (Dkt. No.

67), and said exhibits were filed on November 5, 2024 (Dkt. No. 70).

For the following reasons, the undersigned recommends that Maximus's

Motion for Summary Judgment (Dkt. No. 54) be **GRANTED**.

## I.  BACKGROUND

**A.    Procedural Background.**

Plaintiff filed his original complaint on September 7, 2021, alleging claims of gender-based discrimination and retaliation in violation of Title VII, 42 U.S.C. 2000e, *et seq.*, and Chapter 21 of the Texas Labor Code.  On October 21, 2021, Maximus file a motion to dismiss, arguing that Bernstein's claims failed to exhaust his administrative remedies.  (*See* Dkt. No. 6.)  Specifically, Maximus argued that Bernstein's Title VII claims were time-barred because he failed to file a civil action within 90 days of receiving the notice of right to from the Equal Employment Opportunity Commission ("EEOC"), and his Chapter 21 claims were time-barred because he failed to file a charge of discrimination within 180 days of the alleged unlawful employment practice.  (*See id.*)

On October 27, 2021, Bernstein filed his response, wherein he withdrew his claim under Chapter 21 of the Texas Labor Code, and argued that his original Title VII action was timely filed because he never received the notice of right to sue issued by the EEOC on April 12, 2021, which "presents unique and equitable reasons for tolling the statute of limitations and beginning the countdown from the second notice from the EEOC dated June 3, 2021."  (*See* Dkt. No. 10.)  Concurrently, Bernstein moved for leave to amend his complaint to presents "further factual allegations" in support of his Title VII claim to allege claims of discrimination and retaliation based on race, national origin, and religion.  (*See id.*)

On October 28, 2021, the Court granted Bernstein's motion for leave to amend his complaint (Dkt. No. 11), and Bernstein's First Amended Complaint was deemed filed (Dkt. No 12) on the same day, rendering Maximus's motion to dismiss (Dkt. No. 6) moot.  In the first count of his amended complaint, Bernstein alleges that he was subjected to a hostile work environment because he was "repeatedly sexually harassed by two female employees in the form of unwelcome verbal comments and unwanted physical conduct which where disruptive and interfered with Plaintiff's working conditions."  (*See* Dkt. No. 12 ¶¶ 3.04, 4.05.)  In his second count, Bernstein alleges that he engaged in protected activity when he complained of the harassment and was subsequently terminated.  (*See id*. ¶ 5.06.)  The amended complaint did not assert any cause of action under Chapter 21 of the Texas Labor Code.  (*See id*.)

Maximus moved on October 28, 2021, to dismiss Bernstein's amended complaint pursuant to Rule 12(b)(6) (Dkt. No. 13), again arguing that Bernstein's Title VII claims, as well as any purported claims under Chapter 21, are time-barred and that the doctrine of equitable tolling did not apply.  (*See id*.)  On February 15, 2022, the Court dismissed Bernstein's suit as untimely, finding that equitable tolling was unavailable because Bernstein's case did not present the kind of exceptional circumstances that may warrant equitable tolling.  (Dkt. No. 20.)  Thereafter, Bernstein filed an appeal (Dkt. No. 22), and the United States Court of Appeals for the Fifth Circuit vacated the dismissal and remanded the case for further development of Bernstein's equitable tolling claim.  (*See* Dkt. Nos. 25, 26.)

On June 2, 2023, the case was reassigned to U.S. District Judge Ed Kinkeade (*see* Dkt. No. 29), after which a scheduling order (*see* Dkt. No. 41) was entered setting forth deadlines for (among other things) filing amended pleadings (September 8, 2023); completion of discovery (March 15, 2024); and filing of dispositive motions (April 15, 2024). (*See id*.) After the parties failed to comply with previous deadlines to complete mediation, the Court ordered the parties to complete mediation by January 26, 2024, and to file a joint mediation report by February 2, 2024. (*See* Dkt. No. 47.) Mediation was held on January 22, 2024 (Dkt. No. 52), which ultimately did not result in settlement (*see* Dkt. Nos. 52, 53).

Thereafter, on April 15, 2024, Maximus filed the present motion for summary judgment (Dkt. No. 54) and supporting brief (Dkt. No. 55) ("Def. Br."); Bernstein filed a response (Dkt. No. 61) ("Pl. Br."); and Maximus filed a reply (Dkt. No. 62) ("Repl."). Accordingly, the motion is ripe and ready for determination. Bernstein's first amended complaint (Dkt. No 12) ("Compl."), remains the live complaint in this action. As noted above, Bernstein refers only to Title VII in stating the two counts in his complaint. (*See id*. at 3-5.) Although not asserted in his complaint (nor in his EEOC charge of discrimination), Bernstein's response to the summary judgement motion asserts a new claim for disparate treatment discrimination based on gender, as well as a new retaliation claim under Chapter 21 of the Texas Labor Code. (*See* Dft, Br. at 10-13.)

In support of its summary judgment motion, Maximus submits an appendix (Dkt. Nos. 56-1-56-4) ("Def. App.") containing the following evidence:

4

Exhibit A: Excerpts from Oral Deposition of Kevin Bernstein ("Bernstein Dep.") with attached exhibits ("Ex.") 1-10, Def. App. 001-093).

Exhibit B: Excerpts from Oral Deposition of Michael Licare ("Licare Dep.") with attached Ex. 1, Def. App. 094-123).

Exhibit C: Excerpts from Oral Deposition of Charlotte Chapman-Byrd ("Chapman-Byrd Dep.") with attached Ex. 1-9, Def. App. 124-196).

Exhibit D: Excerpts from Oral Deposition of Amanda (Kirchman) Slavish ("Kirchman Dep.") with attached Ex. 1-2, Def. App. 197-234).

In opposition to summary judgment, Bernstein submits an appendix (Dkt. No. 70)

("Pl. App.") containing the following evidence:

Exhibit A (: Excerpts from Oral Deposition of Kevin Bernstein ("Bernstein Dep."), Pl. App. 0001-0005).

Exhibit B: Excerpts from Oral Deposition of Charlotte Chapman-Byrd ("Chapman-Byrd Dep."), Pl. App. 0006-0012.)

Exhibit C: Email from Charlotte Chapman Byrd dated March 6, 2019 (Ex. C, Pl. App. 0013).

Exhibit D:  Incident report filed by Tanesha Sanders dated March 5, 2019 (Ex. D, Pl. App. 0014-0016)

Exhibit E: Email from Amanda Kirchman dated March 6, 2019 (Ex. E, Pl. App. 0017-0018).

Exhibit F: Email from Michael Licare dated March 7, 2019 (Ex. F, Pl. App. 0019).

Exhibit G: Excerpts from Oral Deposition of Michael Licare ("Licare Dep.") (Ex. G, Pl. App. 0020-0024).

Exhibit H: Declaration of Kevin Bernstein ("Bernstein Decl.") (Ex. H, Pl. App. 0025-0029).

Deposition testimony, declarations, and accompanying exhibits are cited to the

corresponding Def. App. or Pl. App. page number(s).

B.    **Factual Background.**

Maximus is in the business of operating and facilitating a number of federal programs.  The Maximus facility located in Greenville, Texas houses the Federal Debt Management and Collection System Operations ("DMCS"), which is contracted with the U.S. Department of Education Office of Federal Student Aid to serve as an intake facility for correspondence and payments related to student loan accounts.  (Def. Br. at 1; Bernstein Dep., Def. App. 004.)  Maximus operates a National Payment Center ("NPC") in Greenville that processes payments on student loan accounts.  (*Id*.; Licare Dep., Def. App. 098.)

1. **Bernstein's Employment History at Maximus.**

On or about July 20, 2015, Bernstein was hired to serve as a data entry clerk in the Loan Intake Department in the Greenville facility.  (Def. Br. at 2.)  He was initially employed by Xerox, then Maximus took over his employment or about August 1, 2016.  (*Id*.; Bernstein Dep., Def. App. 002-003.)

Bernstein later applied for the position of Financial Processor II and was selected.  (Def. Br. at 2; Bernstein Dep., Def. App. 004, 005, 007.)  As a Financial Processor II, Bernstein worked in the NPC; he processed payments on student loan accounts and posted comments in a work log on his computer to track activities on the accounts.  (*Id*. at 041-042.)  After Bernstein was selected for the Financial Processor II position, he continued to interact with data entry staff until he was fully trained and transitioned into the Financial Processor II job, which was around March or April of 2017.  (Def. Br. at 2; Bernstein Dep., Def. App. 035-036, 080.)

6

Maximus alleges that, around the same time of his transition, Bernstein was counseled for incidents of "disruptive behavior" and interpersonal "conflicts." (Def. Br. at 2.) Bernstein had a "verbal incident" with coworker Ashley Deets regarding Bernstein's use of his personal cell phone in the work area; Deets asked Bernstein to refrain from talking on his cell phone in the work area because it was causing a disruption, and Deets became upset by Bernstein's response to her. (*Id.*; Bernstein Dep., Def. App. 032-035.) Bernstein also had differences with Carrie Stanley, the Team Leader in Data Entry. (Def. Br. at 2; Bernstein Dep., Def. App. 031-032.)

After the incident with Deets, Human Capital Director Cecilia Silburn and Provider Ops Manager Michael Licare met with Bernstein on March 1, 2017, to discuss work processes and expectations for Bernstein's interaction with leadership during his transition to the NPC job. (Bernstein Dep., Def. App. 030-031; 080-081.) Following the meeting, Bernstein was issued a "Note to File" dated March 6, 2017. (*Id.* at 030-032; Ex. 1, Def. App. 080-081.) Bernstein asserts that he received the Note to File because he "had reported that a female employee was stealing time from the company by wasting too much time in the restroom [and] [t]he identified female employee received no discipline." (Pl. Br. at 2.) Although the Note to File mentions the verbal incident with Deets, as well as Bernstein's report that Deets was "stealing time," the stated purpose of the meeting was to discuss "recent incidents regarding [Bernstein's] approach to processes and communication with his leadership." (Bernstein, Dep. Def. App. 032; Ex. 1, Def. App. 080.)

The Note to File, signed by Bernstein and Licare on March 6, 2017, stated:

> Mr. Bernstein was advised that he needs to ensure he follows the directives from leadership if not this can lead to insubordination. Mr. Bernstein needs to refrain from having assertive outbursts that can be disruptive in the workplace.

(*Id.* at Def. App. 081.)

The Note to File also reminded Bernstein about company policy regarding certain behaviors that could lead to immediate discharge, without regard to the progressive disciplinary process, including, but not limited to, threatening, violent, or disruptive behavior; disrespectful or rude behavior toward a supervisor or coworker; insubordination; and participating in any verbal or physical altercation in the workplace.  (*Id.*)  Due to Bernstein's conflicts with co-workers, Licare initiated changes in the process for Bernstein to turn in data to a supervisor in Data Entry to minimize his interactions and to avoid further confrontations with employees in the Data Entry department.  (Bernstein Dep., Def. App. 034-036; Ex. 1, Def. App. 080.)

Bernstein signed the counseling Note to File without comment.  (Bernstein Dep., Def. App. 030; Ex. 1, Def. App. 081.).  Bernstein acknowledged that he understood that "[he] was advised that [he] needed to follow the directives from leadership, and if not, this could lead to insubordination."  (Bernstein Dep., Def. App. 037.)  He did not dispute these warnings and acknowledged that he received them in writing and without objection.  (Pl. Br. at 2; Bernstein Dec., Pl. App. 025-026 at ¶ 4.)

8

Bernstein next received a written warning on July 11, 2017, from supervisor Amanda Kirchman. (Bernstein Dep., Dft. App. 039-041; 083-084; Ex. 3, Def. App. 083-084.) The Company's attendance policy states that an employee who reaches or exceeds eight "attendance points" for absences and tardies in a rolling 12-month period will be dismissed. (Bernstein Dep., Ex. 3, Def. App. 084.) Bernstein had previously received a verbal warning on March 16, 2017, because he had accrued three-and-a-half points. (*Id*. at Def. App. 083.) When Bernstein received a written warning on July 11, 2017, he had five points. (*Id*. at Def. App. 083-084.) Bernstein signed the warning without comment. (Bernstein Dep., Def. App. 040; Ex. 3, Def. App. 084; *see also* Pl. Br. at 2.)

On February 5, 2019, Bernstein received a written warning for posting an unprofessional comment in a work log used to track the status of activities on a borrower's account. (Bernstein Dep, Def. App. 041-042; *see also* Def. Br. at 4.) On February 5, 2019, NPC manager Kenna Kasten received an email from DMCS Quality Control department regarding a notation that Bernstein made in the work log of a borrower's account. (Bernstein Dep., Ex. 4, Def. App. 086.) Bernstein wrote, "no employer on acct, sending to 2nd pass for research, (was given to me because someone didn't want to work)." (*Id*.) Bernstein admitted that he posted this comment on the work log. (Bernstein Dep., Def. App. 044.) Once a comment is posted on the log, it is a permanent record viewable by all authorized personnel, other servicers of the loan, Maximus's client, and the Department of Education. (*Id*. at Def. App. 045.)

Management viewed Bernstein's comment in the log as unprofessional and inappropriate.  (Bernstein Dep., Def. App. 047; Ex. 4, Def. App. 085-087; Licare Dep., Def. App. 100-101; Kirchman Dep., Dft. App. 049-051.)  The next day, February 6, 2019, Kasten counseled Bernstein regarding the comment and issued a written warning, which Bernstein signed.  (Bernstein Dep., Dft. App. 134; Ex. 4, Def. App. 085-087; Kirchman Dep., Def. App.  214; *see also* Pl. Br. at 2; Bernstein Dec., Pl. App. 025-026 at ¶ 4.)  Kasten advised Bernstein that any further inappropriate behavior in any area could lead to further disciplinary action, up to and including termination of his employment.  (Bernstein Dep., Ex. 4, Def. App. 085-087.)  Bernstein understood that any further inappropriate behavior or performance could lead to his termination.  (Bernstein Dep., Def. App. 047-049.)

Less than a month later, on March 1, 2019, Maximus received a complaint that Bernstein inappropriately touched a co-worker during a group photo on Employee Appreciation Day.  Bernstein did not want to be in the photos, so he squatted down in the back to avoid being in the pictures.  (Bernstein Dep., Def. App. 052-054, 056-057.)  Following the photo session, Tanesha Sanders, an employee who worked in the same department with Bernstein, reported to Kirchman that Bernstein touched her inappropriately on her bottom during the photo session.  (Kirchman Dep., Def. App. 203-204.)  Kirchman told Sanders that she did not want to know any other details and advised Sanders to report her concerns to Human Resources.  (*Id*. at 204.)  Sanders was "a little cautious" about going to HR, but Kirchman told her she did not have a choice: either Kirchman would report it to HR, Sanders could

10

report it herself, or they could go to HR together—but it would have to be reported that day.  (*Id.*)  Ultimately, Sanders went to HR herself.  (*Id.*)

On March 5, 2019, Human Capital Senior Specialist Charlotte Chapman-Byrd initiated an investigation and interviewed Sanders regarding her complaint. Chapman-Byrd took notes during the interview.  (*See* Chapman-Byrd Dep., Ex. 1, Def. App. 180-182.)  Sanders confirmed that Bernstein touched her bottom twice during the photo session.  Sanders told Chapman-Byrd that she waited to report the incident to Kirchman until the end of the day on March 1, 2019, after Bernstein had left, because she was afraid there might be a confrontation with Bernstein, who, according to Sanders, "like[s] to retaliate."  Sanders stated that Bernstein "ha[d] retaliated against others via Facebook" and was "being violent."  Sanders also reported that she asked co-worker Arial if Bernstein touched her when he was next to her during the picture, and Arial told her that Bernstein had pushed her while they were posing.  (Chapman-Byrd Dep., Def. App. 156-57; Ex. 1, Def. App. 180-82.)

Following the interview, Chapman-Byrd sent an email to her supervisor, Jeena Phillips, to advise Phillips about the investigation.  Chapman-Byrd indicated that she planned to talk to Bernstein the next day "to get his side of what happened." Chapman-Byrd noted in her email that Bernstein "has a history of disruptive behavior and misconduct" and stated, "he even … came to HR after his CA and question[ed] her in an argumentative manner."  (Chapman-Byrd Dep., Ex. 9 at Def. App. 196.)

11

Chapman-Byrd interviewed Bernstein about the incident on March 6, 2019, and took notes during the interview. Kasten was present for this interview. (Chapman-Byrd Dep. at Def. App. 157-158; Ex. 2, Def. App. 183-184.) When initially questioned about where everyone was standing during the photo, Bernstein said he could not remember, but he recalled that he bumped into Arial during the photos. (Kirchman Dep. Ex. 2, Def. App. 183; Bernstein Dep., Def. App. 058.) When Chapman-Byrd asked Bernstein why he remembered Arial, Bernstein responded that Arial "is the one I hate the most" and "the one person in the room that I really hate." (Kirchman Dep. Ex. 2, Def. App. 184.) When Chapman-Byrd mentioned Tanesha's name, Bernstein stood up, started yelling, and became very aggressive. (Kirchman Dep. at 40; Ex. 2, Def. App. 184.) Although Bernstein eventually sat down, Chapman-Byrd ended the interview. (Kirchman Dep., Def. App. 210; Ex. 2, Def. App. 184.) Chapman-Byrd advised Bernstein that the investigation was highly confidential and instructed him not to discuss the investigation with anyone. (Chapman-Byrd Dep., Def. App. 138; Ex. 2, Def. App. 184.)

Following Bernstein's meeting with Chapman-Byrd, Kirchman reported that Bernstein walked into her office and closed the door, which Kirchman stated made her "a little fearful." (Kirchman Dep., Ex. 1, Def. App. 230.) Kirchman sent an email to Chapman-Byrd, reporting Bernstein's behavior following the meeting. (Chapman-Byrd Dep., Def. App. 159-63; Ex, 3, Def. App. 185-186; Kirchman Dep., Ex. 1, Def. App. 230-31.) Kirchman stated that she sent the email because she

thought it was important for Chapman-Byrd to know about Bernstein's behavior after the meeting. (Kirchman Dep., Def. App. 210, 217.) Bernstein later apologized for coming across as rude and told Kirchman that that he was advised not to talk about anything, to which Kirchman responded "that [is] good because [she] didn't know what all had been discussed." (*Id.*) Bernstein then stated that he knew it was Arial since he pushed her when he was trying to get out of the pictures. (*Id.*) During the meeting, Bernstein requested to be moved to a different work area "so he wouldn't be around anybody"; Kirchman agreed. (*Id.*) Bernstein also stated that he knew Tanesha was involved because "she disappeared with HR for 2 hours the day before (3/5) and when she returned, she spoke to Deborah Benson about the situation." (*Id.* at 231.) Kirchman stated that when Bernstein left her office, he made a lot of noise packing up his belongings. (*Id.*) Another employee (Miesha) heard the noise and was going to check on Bernstein but saw Kirchman shake her head "no." (*Id.*) Kirchman reported that Miesha said Bernstein "frightens her because she doesn't know what he is capable of doing and that he would be the type to do something crazy in the office." (*Id.*) At 5:58 p.m., Kirchman received a text message from Bernstein apologizing "if he came off as rude." (*Id.*) Shortly thereafter, at 6:22 p.m., Kirchman sent her email to Chapman-Byrd. (Kirchman Dep., Ex. 1, Def. App. 230.)

Chapman-Byrd discussed the information she received from Kirchman with Licare, after which Licare made the decision to terminate Bernstein's employment based on his insubordinate and disruptive behavior, reports that Bernstein made

other employees feel fearful, and Bernstein's failure to follow Chapman-Byrd's instruction not to discuss the investigation of Sanders's complaint with anyone. (Chapman-Byrd Dep., Def. App. 128, 133-38, 144-47; Licare Dep., Def. App. 103, 104, 108, 114-16.)

Chapman-Byrd prepared the termination document which included reference to Bernstein's history of behavior issues and prior warnings and disciplinary actions. (Chapman-Byrd Dep., Def. App. 164-79; Ex. 8, App. 195.) Chapman-Byrd sent the termination document to Phillips for approval. (*Id.* at Def. App. 164-79; Ex. 8, Def. App. 195.)

Chapman-Byrd and Licare met with Bernstein on March 7, 2019, to inform him of the termination decision. (Bernstein Dep., Def. App. 062.) After the meeting, Licare prepared an email documenting Bernstein's conduct in the meeting, noting that Bernstein "became upset, cursing and questioning why he was being terminated; getting loud and visibly angry." (Licare Dep., Ex. 1, Def. App. 122.) "[He] became irate jumped up from his seat, knocking over his chair." (*Id.*) Licare tried to explain to Bernstein that he was not being terminated due to the investigation or the allegations against him, but due to his disruptive behavior. (*Id.*) Licare stated that Bernstein attempted to come toward him in an aggressive manner, but Charlotte-Byrd came between them, and eventually pinned Bernstein into the corner so she could open the office door and allow the security officer that was waiting outside to come in. (*Id.*)

14

According to Bernstein, he told Chapman-Byrd during a March 6, 2019 interview that he had been falsely accused, but she never asked Bernstein if he had touched Sanders inappropriately. (Bernstein Dec. at ¶¶ 14-17, Pl. App. 027.) Bernstein admitted that he became upset during the interview but stated he was never violent or threatening, and the interview was cut short prior to any in-depth inquiry. (Bernstein Dec. at ¶ 22, Pl. App. 028.) Regarding Chapman-Byrd's admonition not to discuss the investigation with anyone, Bernstein alleges that Chapman-Byrd did not clarify whether this prohibition applied to Kirchman, a supervisor. (*Id.*)

Regarding his actions during the termination meeting, Bernstein admitted that he stood up and pointed at Licare and that Chapman-Byrd intervened and got in between them. (Bernstein Dep., Def. App. 063.) Bernstein testified that he wanted to leave the meeting, and he "was getting agitated because they wouldn't let [him] leave." (*Id.* at Def. App. 064.) Bernstein testified that he went to the local Sheriff's office after the termination to report that "in the termination process, they were being violent . . . and pinned [him] against the wall." (*Id.* at Def. App. 068-071.) Bernstein states that it was his intent to press charges, but ultimately, he did not file any report. (*Id.*)

## 2. Bernstein's Sexual Harassment Allegations.

Bernstein alleges that he was sexually harassed by two female co-workers, Becky Rigsby and Giselle Rave; Rigsby and Rave were also financial processors who reported to Kirchman. (Bernstein Dep., Def. App. 008-09, 030.) Bernstein alleges that in 2018, he reported to Kirchman that Rigsby and Rave made offensive,

15

unwelcome comments and touched him from late 2017 through early 2018. (Pl. Br. at ¶ 6; Bernstein Dec. ¶ 5.) Bernstein reported that Rave would talk to him about her husband, her unhappy marriage, and repeatedly asked Bernstein whether he was in a relationship. (Bernstein Dep., Pl. App. 0003; Bernstein Dec. ¶ 6, Pl. App. 026.) He also stated that Rave would ask him to hang out with her and get some alcohol, but he consistently declined her invitations. (Bernstein Dec. ¶ 6, Pl. App. 026.) Bernstein also reported that Rave touched him multiple times on his shoulder while they were in training. (Bernstein Dep., Pl. App. 003; Bernstein Dec. ¶ 7, Pl. App. 026.)

Bernstein alleges that he also reported to Kirchman that Rigsby came to his cubicle on at least three occasions, sat on his desk, and flirted with him by making repeated comments such as he was cute and asking if he wanted to go out with her. (Bernstein Dep., Pl. App. 003. Bernstein Dec. ¶¶ 8, 9, Pl. App. 026.) Finally, Bernstein reported that Rigsby physically harassed him by touching his knee. (Bernstein Dep., Pl. App. 003; Bernstein Dec. ¶ 9, Pl. App. 026.) According to Bernstein, Kirchman responded that she would let the human resources manager know about his allegations by sending an email on which she would copy him. (Bernstein Dep., Pl. App. 002.) Bernstein also testified that, other than some emails from HR manager "Cecilia" confirming that "they spoke about [Bernstein's] reports," no further action was taken. (Bernstein Dep., Pl. App. 004; Bernstein Dec. ¶ 10, Pl. App. 026.) Bernstein alleges that the last incident of harassment occurred in

16

March or April 2018.  (Bernstein Dep., Pl. App. 004; Bernstein Dec. ¶ 11, Pl. App. 026.)

Kirchman testified that she did not recall Bernstein ever coming to her to report that he felt he was being harassed.  (*See* Kirchman Dep., Def. App. 202.) Kirchman further testified that if an employee came to her and made a complaint of sexual harassment, "[her] role as a supervisor is to direct them to HR who would be the one to do the investigation." (*See id*.)  Chapman-Byrd testified that she never received a report either directly or indirectly that Bernstein complained of being harassed.  (*See* Chapman-Byrd Dep., Def. App. 148.)

On October 17, 2019, after his termination, Bernstein filed a charge of discrimination with the EEOC alleging that he had been sexually harassed by two female coworkers and was fired in retaliation for reporting this harassment to management.  (Bernstein Dep., Def. App. 076-077; Ex. 10, Def. App. 092-093.)

## II.  LEGAL STANDARD

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  A factual "issue is material if its resolution could affect the outcome of the action."  *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003).  "A factual dispute is 'genuine,' if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party."  *Crowe v. Henry*, 115 F.3d 294, 296 (5th Cir. 1997).

A party seeking summary judgment bears the initial burden of showing the absence of a genuine issue for trial. *Duffy v. Leading Edge Prod., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995). The movant's burden can be satisfied by demonstrating that there is an absence of evidence to support the nonmoving party's case, which the nonmovant bears the burden of proving at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets its initial burden, the nonmovant must show that summary judgment is not proper. *Duckett v. City of Cedar Park, Tex.*, 950 F.2d 272, 276 (5th Cir. 1992). The parties may satisfy their respective burdens "by tendering depositions, affidavits, and other competent evidence." *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992) (citing Fed. R. Civ. P. 56(e); *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991)).

The party opposing the summary-judgment motion must identify specific evidence in the record and state the precise manner in which that evidence supports the party's claim. *Esquivel v. McCarthy*, No. 3:15-CV-1326-L, 2016 WL 6093327, at *2 (N.D. Tex. Oct. 18, 2016) (citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1988)). "Rule 56 does not impose a duty on the court to 'sift through the record in search of evidence' to support the nonmovant's opposition to the motion for summary judgment." *Id.* (citing *Ragas*, 136 F.3d at 458; *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)). All evidence must be viewed in the light most favorable to the party opposing the summary judgment motion. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993) (citing *Reid v. State Farm Mut. Auto.*

18

*Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986)).  "In the employment discrimination arena, the 'salutary function of summary judgment' is that it 'allows patently meritless cases to be nipped in the bud.'"  *Molden v. E. Baton Rouge Par. Sch. Bd.*, 715 F. App'x 310, 313 (5th Cir. 2017) (quoting *Caldwell v. KHOU-TV*, 850 F.3d 237, 241 (5th Cir. 2017)).

## III.  ANALYSIS

Bernstein alleges that he was sexually harassed due to his male gender in violation of Title VII.  (*See generally* Compl.)  Bernstein also alleges that his employment was terminated by Maximus in retaliation for reporting the alleged sexual harassment in violation of Title VII.  (*See generally id*.)  As noted above, in addition to the two counts asserted in his complaint, Bernstein's response asserts two new claims: one for disparate treatment discrimination based on gender and another for retaliation under Chapter 21 of the Texas Labor Code.  (*See* Def. Br. at 10-13.) For the reasons discussed below, the undersigned concludes that Maximus is entitled to summary judgment as a matter of law.

## A.    Bernstein's Sexual Harassment Claim Fails as a Matter of Law.

To establish a prima facie sexual harassment claim based on hostile work environment, an employee must show: (1) he belongs to a protected class; (2) he was subject to unwanted or unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a "term, condition, or privilege of employment"; and (5) the employer "knew or should have known of the harassment and failed to

act promptly to address it." *Cerda v. Blue Cube Operations, L.L.C.*, 95 F.4th 996, 1003 (5th Cir. 2024).

### 1. Bernstein Has Failed to Establish Any Actionable Harassment.

For harassment to be actionable, it must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment." *See Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). In determining whether an environment is "hostile" or "abusive," courts look at the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Simple teasing, offhand comments, sporadic use of offensive language, occasional jokes related to a claimant's protected trait, and isolated incidents (unless extremely serious) will generally not amount to discriminatory changes in the terms and conditions of employment. *See EEOC v. Boh Bros. Constr. Co., L.L.C.*, 731 F.3d 444, 461 (5th Cir. 2013).

A hostile work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998); *see also Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263–64 (5th Cir. 1999). The objectionable conduct must affect the "conditions" of the alleged

20

victim's employment. *Oncale v. Sundowner Offshores Svcs., Inc.*, 523 U.S. 75, 81 (1998). Title VII does not prohibit all verbal or physical harassment in the workplace but is directed only to an employer's discrimination "because of" sex. *Indest*, 164 F.3d at 264. "[C]asual or isolated manifestations of a discriminatory environment are not sufficient to demonstrate a hostile working environment under the law." *Gearhart v. Eye Care Centers of Am., Inc.*, 888 F. Supp. 814, 825 (S.D. Tex. 1995). "Incidental, occasional or merely playful sexual utterances will rarely poison the employee's working conditions to the extent demanded for liability." *Indest*, 164 F.3d at 264.

The Fifth Circuit has also emphasized that the Supreme Court's cases regarding sexually hostile work environment are ones that involve allegations of "extensive, long-lasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiff's work environment." *See id.* (citing *Faragher*, 524 U.S. 775; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Oncale*, 523 U.S. 75; *Harris*, 510 U.S. 17; *Meritor Sav. Bank, FSB*, 477 U.S. 57). Thus, the sexual harassment standard is a "demanding" one to reach. *See Indest*, 164 F.3d at 264. As the Supreme Court explained, these high standards are required to ensure that Title VII does not become a "general civility code." *See Faragher*, 524 U.S. at 788.

Bernstein's complaint falls short of the relevant standards for a hostile work environment claim. He alleges that he was "repeatedly sexually harassed by two female employees in the form of unwelcome verbal comments and unwanted physical conduct which where disruptive and interfered with [his] working conditions." (Compl. ¶ 3.04.) The alleged conduct occurred in late 2017 to early

2018. (Bernstein Dep., Def. App. 012-017.) With respect to Rave, Bernstein alleged that she: (1) made comments about her unhappy marriage and stated she was looking for someone else; (2) asked Bernstein about his relationship status; (3) invited him to "hang out" and "get [ ] some alcohol and then maybe come to her place"; (4) tried to connect with him on social media (which he declined); and (5) touched him "about four times" on the shoulder for about four to five seconds during training. (*Id.* at Def. App. 012-13.) With respect to Rigsby, Bernstein alleged that she: (1) came into his cubicle about three times; (2) sat on his desk and tried to flirt with him; (3) made comments that he was cute; (4) asked if he wanted to go out "about maybe four times"; and (5) touched his knee for about six or seven seconds. (*Id.* at Def. App. 016, 020-22.) Bernstein testified that the alleged conduct by Rave and Rigsby stopped after he reported it to Kirchman, and the last incident occurred March or April of 2018. (Def. App. 013-014, 017.)

Bernstein's allegations amount to casual flirting, sexual innuendos, and a sporadic incidents of brief touching over a period of a few months—conduct that does not rise to the level of the severe or pervasive conduct required for an actionable hostile work environment claim. *See, e.g.*, *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 328–29 (5th Cir. 2004) (holding conduct that included comments, touching and attempted kissing, and grabbing or brushing against the plaintiff's breasts and behind was insufficient to constitute actionable sex harassment); *Shepherd v. Comptroller of Pub. Accts. of State of Texas*, 168 F.3d 871, 874–75 (5th Cir. 1999) (affirming summary judgment where alleged comments and touching the plaintiff's

shoulder did not create a hostile or abusive working environment); *Gearhart*, 888 F. Supp. at 824–25 (holding conduct characterized as "nothing more than some evidence of flirting, some casual touching, and sexual innuendos or jokes" was not severe or pervasive as a matter of law).

In *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 402 (5th Cir. 2013), the Fifth Circuit determined that a hostile work environment existed when two male maintenance employees sniffed and hovered over a female employee "in a small, confined space." *Royal*, 736 F.3d at 401–02. The court found that the conduct was sufficiently pervasive because "[plaintiff] worked in a small office area and was subject to each man's objectionable conduct approximately twelve times over four days. It went on to find that "[t]hese menacing acts, which were done over [plaintiff] as she was sitting and some of which were done by a man who had previously been in prison, can certainly be seen as 'physically threatening,' 'humiliating,' and frequent, three factors that indicate sexual harassment[.]" *Id.* at 402. The court also acknowledged that the short time frame at issue lent itself to finding the conduct pervasive. *Id.* at 403.

In contrast, when a woman complained of "a few scattered comments . . . that may be interpreted as being of a sexual nature," the Fifth Circuit found that the remarks "simply [did] not approach the level of 'extreme conduct that would prevent [the plaintiff] from succeeding in the workplace.'" *Silva v. City of Hidalgo, Tex.*, 575 F. App'x 419, 426 (5th Cir. 2014). The facts here are more comparable to *Silva* than *Royal*. Bernstein complained of casual flirting and isolated incidents of brief

23

touching over a period of a few months, which is not the type of physically

threatening, humiliating, and frequent conduct the court found actionable in *Royal*.

Because the conduct alleged by Bernstein does not rise to the level of severe or

pervasive conduct that is required to establish an abusive and hostile working

environment, his sexual harassment claim fails as matter of law.

### 2. Bernstein's Sexual Harassment Claim is Time-Barred.

Maximus is entitled to judgment as a matter of law on Bernstein's sexual

harassment claim for an additional independent reason.  Bernstein's sexual

harassment claim is time-barred, as the last alleged act of harassment occurred well

over a year before Bernstein filed his EEOC charge.[1]  In deferral states such as

Texas,[2] an aggrieved party must file a charge of discrimination with the EEOC

within 300 days after the alleged unlawful practice occurred.  *See* 29 U.S.C.

§ 626(d)(1)(B); *see also Clark v. Resistoflex Co.*, 854 F.2d 762, 765 (5th Cir. 1988).  "[I]f

the EEOC determines that there is no reasonable cause to believe that an unlawful

employment practice has occurred, the EEOC issues a letter informing the aggrieved

party that it has the right to sue in federal district court . . . within 90 days of the

receipt of the letter."  *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 411 (5th Cir.

---

[1] Maximus moved for summary judgment on the basis that Bernstein's claim was time-barred.  (Def. Br. at 10-11.)  Bernstein did not respond to this argument.  (*See generally* Pl. Br.)

[2] "A deferral state is one in which (1) a state law prohibiting . . . discrimination in employment is in effect, and (2) a state authority has been set up to grant or seek relief from such discriminatory practice."  *Barr v. Stripes L.L.C.*, No. 21-20278, 2022 WL 1044695, at *4 (5th Cir. Apr. 7, 2022) (unpublished) (citations and internal quotations omitted).

2003) (citing 29 C.F.R. § 1601.19(a)).  "A plaintiff alleging employment

discrimination must file a civil action no more than ninety days after [he] receives

statutory notice of [his] right to sue from the EEOC.  The ninety-day window is

strictly construed and is a precondition to filing suit in district court."  *Smith v. Alcorn*

*State Univ.*, 451 F. App'x 464, 465 (5th Cir. 2011) (quoting *Duron v. Albertson's LLC*,

560 F.3d 288, 290 (5th Cir. 2009) (internal quotation marks omitted)).

Here, by Bernstein's own admission, the last alleged act of harassment

occurred in March or April 2018.  (Bernstein Dep., Def. App. 014, 017.)  Bernstein

filed his charge of discrimination on October 17, 2019, a year-and-a-half after the

alleged harassment ended.  (*Id.*; Ex. 10, Def. App. 092-93.)  Because "[t]he ninety

day window is strictly construed and is a precondition to filing suit in district court,"

*Smith*, 451 F. App'x at 465 (quoting *Duron*, 560 F.3d at 290) (internal quotation

marks omitted), Bernstein's harassment claim is time-barred as a matter of law.  *See*

*Sharp v. Texas Dep't of Fam. & Protective Servs.*, No. 3:13-CV-4092-D, 2014 WL

5802860, at *1 (N.D. Tex. Nov. 7, 2014).  Accordingly, dismissal with prejudice is

warranted because Bernstein's claims are time-barred.

**B.    Bernstein's Retaliation Claim Fails as a Matter of Law.**

Bernstein's retaliation claim also fails on multiple grounds.  Bernstein has not

established a prima facie case of retaliation because he did not engage in any

protected activity, and he does not adduce evidence establishing a causal link

between any alleged protected activity and his termination.  Additionally, the

evidence establishes that Maximus terminated Bernstein for legitimate reasons

25

unrelated to any alleged protected activity. Bernstein cannot establish that any alleged protected activity was the "but-for" cause of his termination.

### 1. Bernstein Has Failed to Establish a Prima Facie Case of Retaliation.

To establish a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in activity protected by the discrimination laws; (2) he was subjected to an adverse employment action subsequent to the protected activity; and (3) a causal connection exists between his participation in the protected activity and the adverse employment action. *See Holt v. JTM Indus., Inc.*, 89 F.3d 1224, 1226 (5th Cir. 1996). If the plaintiff makes a prima facie case, the employer must articulate a legitimate, non-retaliatory reason for its action. *See Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 433 (5th Cir. 1995). Following the articulation of the non-retaliatory reason, the plaintiff must prove the articulated reason is merely pretextual and that "but for" his protected activity, he would not have been discharged. *See Ray*, 63 F.3d at 433. To defeat summary judgment, the plaintiff must produce substantial probative evidence that the proffered reasons were not the true reason for the employment decision and that the real reason was his participation in the alleged protected activity. *See Chaffin v. John H. Carter Co.*, 179 F.3d 316, 319–20 (5th Cir. 1999); *see also Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483 (5th Cir. 2004).

Bernstein cannot establish at least the third element of a prima facie retaliation claim—a causal connection between the alleged protected activity and his termination. He alleges that he reported the alleged harassment in February or March of 2018, and the harassment stopped after he made the report. (*See* Bernstein

26

Dep., Def. App. 009, 017.)  Thus, the alleged protected activity was a full year before Bernstein was discharged on March 7, 2019.  In fact, Bernstein conceded in his deposition that he had no facts showing a causal connection.  (*See id*. at Def. App. 067.)

   In his response to the summary judgment motion, Bernstein contends for the time that there is evidence of more "recent retaliation," speculating that an inference can be drawn from Kirchman's March 6, 2019 email (Kirchman Dep. Ex. 3, Def. App. 185-86) that Bernstein was lodging a complaint of harassment because he asked to be moved to a different work area.  (*See* Pl. Br. at 12.)  Bernstein suggests that a jury could infer protected activity because Kirchman could have sent her March 6 email to HR to notify HR of a potential complaint by Bernstein "of a hostile work environment that needed to be addressed."  (*Id*.)  Bernstein offers no evidence to support this argument.

   Bernstein further asserts that "Kirchman has not been deposed" and has not "explain[ed] the purpose and intent of her March 6, 2019 e-mail."  This is incorrect. Kirchman was deposed on March 24, 2024.  (*See* Kirchman Dep., App. 197-229.) Kirchman testified extensively about the circumstances that triggered her email to Chapman-Byrd, including directly answering a question posed by Bernstein's counsel regarding why she sent the email.  (*See id*.)  Specifically, Kirchman testified that:

- She was not aware that Bernstein had spoken to HR that day until he told her.  (Kirchman Dep., Def. App. 208.)

- Chapman-Byrd had not directed her to report any conversation she had with Bernstein.  (*Id*. at 210.)

27

- Bernstein advised her that he had been instructed not to talk about his meeting with HR or about the investigation, but "he continued to go on and on and talk about things that [she] was completely unaware of," even though she advised him that she "didn't know what had been discussed [with human resources]." (*Id.* at 221.)

- She sent the email to Chapman-Byrd because she wanted to make sure that HR and her supervisor were aware that Bernstein had discussed the HR investigation with her, despite it being "common practice" not to talk about it and being specifically instructed by HR not to talk about it. (*Id.* at 210-11.)

Thus, contrary to Bernstein's argument, Kirchman's deposition testimony leaves very little confusion about her reasons for sending the email to Chapman-Byrd. Kirchman clearly expressed her concern that Bernstein told her details about the investigation, even after informing her that he was advised not to discuss it. Nothing in Kirchman's testimony or her email to Chapman-Byrd supports Bernstein's newfound theory that the email "was not to complain but to notify HR of a potential complaint by the only male employee in the department of a hostile work environment that needed to be addressed." (*See* Pl. Br. at 12.) Accordingly, the undersigned concludes that Bernstein's allegation that he engaged in protected activity close to his termination is not supported by the record, which only leaves his alleged complaint of harassment in February or March of 2018 upon which he bases a retaliation claim. As explained above, Bernstein has presented no evidence to show a causal connection between that alleged complaint and his termination a year later, and he acknowledged during his deposition that he had no such linking evidence. (Def. App. 67.) Because Bernstein cannot make even a prima facie case of retaliation, dismissal is warranted.

28

## 2. Maximus Has Provided Legitimate Reasons for Terminating Bernstein.

Even if Bernstein could establish the prima facie elements of a retaliation claim, his claim still fails as a matter of law because Maximus provides legitimate reasons for its decision to terminate Bernstein's employment that are not related to any alleged protected activity.

As stated in the termination documents, Maximus made the decision to terminate Bernstein's employment based on his insubordinate and disruptive behavior, reports that Bernstein made other employees feel fearful, and Bernstein's noncompliance with Chapman-Byrd's instruction not to discuss her investigation of Sanders' complaint with anyone.  (Chapman-Byrd Dep., Ex. 4, Def. App. 187; Ex. 8, Def. App. 195.)

Bernstein has not rebutted these reasons other than to express his disagreement with Maximus's determination that he had engaged in insubordinate and disruptive behavior in March 2019 (Bernstein Dep., Ex. 4, Def. App. 085-87), less than a month after he was issued a written warning for unprofessional and unacceptable behavior.  (*See generally* Pl. Br.)  But the Fifth Circuit has repeatedly held that a plaintiff's disagreement that he engaged in misconduct or a company's decision is not sufficient to avoid summary judgment.  Indeed, it has explained that "employment laws do not transform federal courts into human resource managers, so the inquiry is not whether [the employer] made a wise or even a correct decision to terminate [the plaintiff]."  *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 826 (5th Cir. 2022).  The question is motive, not whether the employer conducted a complete

29

investigation or reached a correct decision. *See id.* (affirming summary judgment for employer and holding that employers are "entitled to be unreasonable" in terminating their employees "so long as [they] do not act with discriminatory animus."); *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) ("[E]vidence that the employer's investigation merely came to an incorrect conclusion does not establish a racial motivation behind an adverse employment decision. Management does not have to make proper decisions, only non-discriminatory ones."); *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 589 n.82 (5th Cir. 2020) (affirming summary judgment and noting that it is not the ultimate accuracy of the employer's reason that matters, but only whether the employer believed in good faith that the employee engaged in the conduct leading to termination).

Bernstein has not shown that the legitimate, non-retaliatory reasons asserted by Maximus are a pretext for unlawful retaliation, nor has he presented any competent evidence of a retaliatory motive. In fact, Bernstein has presented no evidence that Licare, the person who made the decision to terminate his employment on March 7, 2019, was even aware of Bernstein's alleged complaint of harassment. Because there is no evidence supporting a finding that Maximus's proffered non-retaliatory reasons for termination are pretext, summary judgment is warranted on Bernstein's retaliation claim. *See, e.g.*, *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808–09 (5th Cir. 2007) (affirming summary judgment for employer where plaintiff failed to establish that the employer's reasons for termination were

30

pretextual, and plaintiff did not establish but-for causation); *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188–89 (5th Cir. 1997) (rendering judgment for employer on retaliation claim where employer offered legitimate reasons explaining the adverse action, and plaintiff failed to show that the employer's reorganization was a pretext or that the employer had a retaliatory motive).  Accordingly, summary judgment should be granted on Bernstein's retaliation claim under Title VII.

Additionally, to the extent that Bernstein attempts to assert a claim for retaliation under Chapter 21 of the Texas Labor Code (*see* Pl. Br. at 10-11),[3] that claim fails for the same reasons discussed above.  Additionally, Bernstein cannot withstand summary judgment on a claim that he has not alleged in his complaint. *See Skaria v. Abbott Labs., Inc.*, No. 3:20-CV-1203-D, 2021 WL 3772389, at *6 (N.D. Tex. Aug. 25, 2021).  Maximus is entitled to summary judgment on Bernstein's Title VII retaliation claim.

## C.    Bernstein's Disparate Treatment Claim Fails as a Matter of Law.

Bernstein includes a claim for "Disparate Treatment based on Gender" in his response to Maximus's motion for summary judgment, a claim not asserted in his complaint or in his EEOC discrimination charge.  (*See* Pl. Br. at 12-13; *see also* Compl. at 3-5; Bernstein Dep, Ex. 10, Def. App. 092-093.)   This claim also fails.

---

[3] As noted above, Bernstein refers only to Title VII in stating the two counts in his complaint (*see* Compl. at 3-5), but his response attempts to assert what amounts essentially to a new claim under state law (*see* Pl. Br. at 10-11).

First, Bernstein did not allege a disparate treatment claim in the Complaint.[4] "It is well-settled that '[a] claim which is not raised in the complaint but, rather, is raised only in opposition to a motion for summary judgment is not properly before the court." *Med-Cert Home Care, LLC v. Becerra*, No. 3:18-CV-02372-E, 2023 WL 6202050, at *10 (N.D. Tex. Sept. 21, 2023) (quoting *Cutrera v. Bd. of Sup'rs of Louisiana State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005)); *see also Dixon v. Ally Bank*, 853 F. App'x 977, 978 (5th Cir. 2021). Therefore, Bernstein's disparate treatment claim is not properly before the Court, and such claim cannot constitute a valid basis for withstanding summary judgment.

Second, even if the Court could consider a disparate treatment claim, such claim would not survive summary judgment analysis. Bernstein attempts to show disparate treatment in comparison to co-worker Sanders, citing as evidence Kirchman's March 6, 2019, email to Chapman-Byrd. (Pl. Br. at 12 (citing Pl. App. 017-18).) According to Bernstein, "Kirchman's March 6 e-mail clearly put [Chapman-]Byrd on notice that Sanders spoke to a co-employee about an ongoing investigation," (Pl. Br. at 13) because Kirchman reported to Chapman-Byrd that Bernstein overheard Sanders discussing the HR investigation with another employee. Bernstein speculates that this shows that Sanders "engaged in the same conduct" but was not terminated. (*Id.*)

---

[4] Maximus asserts that Bernstein's EEOC complaint did not allege a disparate treatment claim as well. (Reply at 3.)

Bernstein provides little evidence to support his belated and speculative argument that he was subjected to disparate treatment based on his gender. Notably, "[t]he party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Esquivel*, 2016 WL 6093327, at *2 (internal citation omitted). Furthermore, the court is not required "to 'sift through the record in search of evidence' to support the nonmovant's opposition to the motion for summary judgment." *Id.* Other than Kirchman's March 6th e-mail to Chapman-Byrd, Bernstein fails to identify any such evidence.

Bernstein attempts to argue that the email shows that Sanders "engaged in the same conduct" but was not terminated (Pl. Br. at 13), but even viewing the evidence in the light most favorable to Bernstein in accordance with summary judgment standards, *Rosado*, 5 F.3d at 123 (internal citation omitted), Bernstein fails to meet his burden to provide competent evidence to defeat Maximus's motion for summary judgment because the email cannot do the work Bernstein instends. The email states, in relevant part:

> [Bernstein] also stated that people needed to be more discrete about situations. I asked how so. He stated he knew that Tanesha was involved when she disappeared with HR for 2 hours the day before (3/5) and when she returned[,] she spoke to Deborah Benson about the situation.

(Chapman-Byrd Dep., Ex 4, Def. App. 186.)

The burden to prove discrimination by comparison to other employees is a steep one. The plaintiff must prove that he was treated less favorably than similarly

33

situated employees outside of his protected class, under virtually identical circumstances. *See, e.g.*, *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009). To be "similarly situated," comparators must be "nearly identical." *Lee*, 574 F.3d at 260. They must have "held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Id.* "[C]ritically, the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Id.* The Fifth Circuit has consistently "defined 'similarly situated' narrowly, requiring the employees' situations to be 'nearly identical.'" *West v. City of Houston, Texas*, 960 F.3d 736, 740 (5th Cir. 2020) (quoting *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 406 (5th Cir. 2005)).

Bernstein's attempted comparison to Sanders falls short for several reasons. First, Bernstein admits that he doesn't know "whether or not Sanders received the same admonition that Bernstein received" not to discuss the HR investigation. (*See* Pl. Br. at 13.) And even if Sanders received the same admonition, there is no evidence that Sanders and Bernstein engaged in similar conduct. There is also no evidence regarding what Sanders was doing in HR or what she discussed with co-worker Deborah Benson. Bernstein offers only his speculation that Sanders spoke with Benson "about the situation." Thus, there is no factual basis for Bernstein's conclusory assertion that "Sanders engaged in the same conduct."

34

There is also no evidence that Sanders and Bernstein had "essentially comparable violation histories." *Lee*, 574 F.3d at 260.  Bernstein acknowledges that he has a history of disciplinary actions, including the warning he received on February 6, 2019, with the admonition that any further inappropriate behavior in any area could lead to the termination of his employment.  (*See* Pl. Br. at 2; *see also* Bernstein Dep., Def. App. 85-87.)

For all these reasons, Bernstein's attempt to avoid summary judgment by asserting a new disparate treatment claim fails as a matter of law.

## IV.  RECOMMENDATION

Because Bernstein fails to present sufficient summary judgment evidence to create a genuine issue of material fact on any of his claims, the undersigned recommends that Maximus's Motion for Summary Judgment (Dkt. No. 54) be **GRANTED**, and Bernstein's claims should all be **DISMISSED WITH PREJUDICE**.

**SO RECOMMENDED** on December 2, 2024.


_____
BRIAN McKAY
UNITED STATES MAGISTRATE JUDGE

## <u>NOTICE OF RIGHT TO OBJECT</u>

A copy of these findings, conclusions, and recommendation will be served on all parties in the manner provided by law.  Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  To be specific, an objection must identify the finding or recommendation to which objection is made, state the basis for the objection, and indicate the place in the magistrate judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996), *modified by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections to 14 days).